UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X

MARA GRACIANI,

                   Plaintiff,

      -against-

PATIENTS MEDICAL, P.C., DR. RASHMI
GULATI, Medical Director, DEE GULATI,
Practice Director, and JUDY PENTA,
Practice Manager,

                  Defendants.
-----------------------------------------------------------------------X

**MEMORANDUM & ORDER**

**13-CV-2751 (NGG) (RLM)**

NICHOLAS G. GARAUFIS, United States District Judge.

      Plaintiff Mara Graciani brings this employment discrimination action against Defendants

Patients Medical, P.C. ("Patients Medical"), Dr. Rashmi Gulati ("Dr. Gulati"), Dee Gulati

("Mr. Gulati"), and Judy Penta (together, "Defendants"), for violations of Title VII of the Civil

Rights Act of 1964 ("Title VII"), as amended by the Pregnancy Discrimination Act of 1978,

42 U.S.C. §§ 2000e(k), 2000e-2(a)(1); the New York State Human Rights Law ("NYSHRL"),

N.Y. Exec. Law § 296; and the New York City Human Rights Law ("NYCHRL"), N.Y.C.

Admin. Code §§ 8-107, 8-602 to -604. (See Compl. (Dkt. 1).) Plaintiff alleges that Defendants

terminated her employment because of her pregnancy, unlawfully retaliated against her for

alleging pregnancy discrimination, and subjected her to a hostile work environment. (See

generally id.) Plaintiff brings her NYSHRL and NYCHRL claims against all Defendants, and

brings her Title VII claims against only Patients Medical. Defendants have moved for summary

judgment on all claims. (See Defs.' Not. of Mot. for Summ. J. (Dkt. 40).) For the reasons

discussed below, Defendants' motion is GRANTED IN PART and DENIED IN PART.

1

## I.   BACKGROUND

### A.   Facts

Except as otherwise noted, the following facts are undisputed.  Where facts are in

dispute, the court credits Plaintiff's version of the particular fact, if it is supported by record

evidence.  The court has not included in this section facts introduced by the parties that are not

material to Plaintiff's claims.

### 1.   Patients Medical and Management

Defendant Patients Medical is an integrative and holistic health care center with its

principal office in New York, New York.  (Statement of Undisputed Material Facts Pursuant to

Local Rule 56.1 in Support of Defs.' Mot. for Summ. J. ("Defs.' 56.1") (Dkt. 42) ¶ 1; Pl.'s Local

Rule 56.1 Statement of Fact ("Pl.'s 56.1") (Dkt. 31) ¶ 1.)  Dr. Gulati is the founder and sole

owner of Patients Medical, and practices there as a licensed physician.  (Defs.' 56.1 ¶¶ 2-3;

Pl.'s 56.1 ¶¶ 2-3.)  Mr. Gulati is the practice director of Patients Medical, and is responsible for

the overall management of the practice.  (Defs.' 56.1 ¶¶ 4-5; Pl.'s 56.1 ¶¶ 4-5.)

From in or around December 2008, through in or around March 2014, Patients Medical

employed Defendant Judy Penta.  (Defs.' 56.1 ¶ 6; Pl.'s 56.1 ¶ 6.)  Patients Medical first

employed Penta as a part-time consultant, later transferred her to the full-time position of patient

care specialist, and in or around August 2010, transferred her to the position of office manager, a

position she held until her voluntary resignation in March 2014.  (Defs.' 56.1 ¶ 7; Pl.'s 56.1 ¶ 7.)

As office manager, Penta's responsibilities included overseeing the day-to-day operations of

Patients Medical.  (Defs.' 56.1 ¶ 8; Pl.'s 56.1 ¶ 8.)  At times, Penta served as Plaintiff's

supervisor.[1]  (Pl.'s 56.1 ¶ 8; Tr. of Mar. 20, 2014, Dep. of Mara Graciani ("Pl. Dep.") (Pl.'s

---

[1] Plaintiff's counsel submitted record materials, such as deposition transcripts and documents produced in discovery, as exhibits to her memorandum of law.  Plaintiff's counsel is reminded that a sworn declaration made on

Mem. of Law in Opp'n to Summ. J. ("Pl.'s Mem.") (Dkt. 32), Ex. A (Dkt. 32-1)) at 27:7-15.)

Penta was also responsible for employee scheduling; handling disputes between members of the administrative staff or between members of the administrative staff and doctors; and to some extent, disciplining administrative staff. (Pl.'s 56.1 ¶ 8; Pl. Dep. at 27:7-12; Tr. of Mar. 24, 2014, Dep. of Judy Penta ("Penta Dep.") (Pl.'s Mem., Ex. B. (Dkt. 32-2)) at 70:18-73:22.) Penta had no ownership interest in Patients Medical. (Defs.' 56.1 ¶ 9; Penta Dep. at 254:16-18.) Although Penta was authorized to communicate an employee's termination to that employee, Mr. Gulati was ultimately responsible for hiring and firing decisions. (See Tr. of Mar. 25, 2014, Dep. of Dee Gulati ("Mr. Gulati Dep.") (Pl.'s Mem., Ex. H (Dkt. 32-8)) at 88:7-20.) During her employment with Patients Medical, Dr. and Mr. Gulati served as Penta's supervisors. (Defs.' 56.1 ¶ 10; Pl.'s 56.1 ¶ 10.)

2.     Financial Condition of Patients Medical

During Plaintiff's employment with Patients Medical, several of the practice's doctors left the practice or reduced their hours, including Dr. Roberts, Dr. Howard, Dr. Kokayi, and Dr. Gofarth. (Defs.' 56.1 ¶ 19; Tr. of Mar. 26, 2014, Dep. of Rashmi Gulati, M.D. ("Dr. Gulati Dep.") (Pl.'s Mem., Ex. F (Dkt. 32-6)) at 79:15-23, 80:20-81:6.) By late 2012, "money was a scarcity in the company." (Dr. Gulati Dep. at 87:22-24.) For the year 2012, Patients Medical's tax return reflects a loss of $1,255,000. (Defs.' 56.1 ¶ 23; See Form 1120S, Patients Medical, PC (Decl. of Samantha Abeysekera, Esq. in Support of Defs.' Mot. for Summ. J. ("Abeysekera Decl.") (Dkt. 43), Ex. F (Dkt. 43-6) (filed under seal)) at PM001942.) In order to meet payroll, Dr. and Mr. Gulati have taken out lines of credit on their homes and commercial property. (Defs.' 56.1 ¶ 21; Dr. Gulati Dep. at 209:18-210:6.) In approximately the summer of 2012,

---

personal knowledge of the material and exhibits contained therein is a more appropriate way to submit record materials to the court. In addition, Plaintiff's counsel is reminded to comply with the court's Individual Rules, which require a table of contents and a table of authorities for briefs over ten pages in length.

Dr. Gulati stopped taking a paycheck for her work at the practice. (Defs.' 56.1 ¶ 22; Dr. Gulati Dep. at 181:20-182:6; see also Penta Dep. at 84:23-85:11.) Around the same time period, and faced with deteriorating financials, Patients Medical attempted to "chang[e] the model" or "add[] some modalities," including massage therapy, Reiki, and acupuncture, in order to improve the performance of the practice. (Defs.' 56.1 ¶ 23; Dr. Gulati Dep. at 182:7-184:13; see also Pl. Dep. at 200:4-10 (explaining that in 2012, "the stem cell was being, um, performed at that time, um, there was Reiki, there was massages, there was acupuncture . . . ").) This included adding employees and doctors to provide the new services. (Dr. Gulati Dep. at 184:3-16; see also Pl. Dep. at 200:6-201:20.)

Around late December 2012 or early January 2013, Mr. Gulati determined that Patients Medical was overstaffed, and orally conveyed to Penta that the practice would "have to let 10 or 15 people leave in 2013." (Defs.' 56.1 ¶ 25; Mr. Gulati Dep. at 143:17-144:9.) Plaintiff was included on Mr. Gulati's "mental list" of employees who would be laid off. (Defs.' 56.1 ¶ 26; Mr. Gulati Dep. at 144:7-9.) There is no written record, however, that Mr. Gulati determined that Plaintiff's employment was to be terminated at this time. (Pl.'s 56.1 ¶ 119; Mr. Gulati Dep. at 147:14-18.) Plaintiff was included on Mr. Gulati's list, in part, because the doctor that she was supporting as a medical assistant had left the practice. (Defs.' 56.1 ¶ 27; Mr. Gulati Dep. at 135:23-136:4, 145:10-18.) However, in January 2013, Patients Medical transferred Dr. Gulati's administrative assistant to help in the billing department, and reassigned Plaintiff—who at the time was serving as a medical assistant—to the administrative assistant position. (Defs.' 56.1 ¶ 34; Mr. Gulati Dep. at 133:20, 151:23-152:6, 154:15-9.) See also infra Part I.A.3.b.

3.     <u>Patients Medical's Employment of Plaintiff</u>

Patients Medical hired Plaintiff on or about March 8, 2012. (Defs.' 56.1 ¶ 11; Pl.'s 56.1 ¶11.) During her employment, Plaintiff first worked as a medical assistant, and later as an administrative assistant. (Defs.' 56.1 ¶ 12; Pl.'s 56.1 ¶ 12.)

a.     *Medical Assistant to Dr. Roberts and Dr. Howard*

As a medical assistant, Plaintiff assisted Dr. Roberts and Dr. Howard. (Defs.' 56.1 ¶ 14; Pl.'s 56.1 ¶ 14.) Her job duties included drawing blood, mixing and inserting IVs, taking vital signs, assisting the doctors in various procedures, and managing the doctors' scheduling of patients. (Defs.' 56.1 ¶ 15; Pl.'s 56.1 ¶ 15.) In her role as medical assistant, Plaintiff was awarded employee of the month for August 2012. (Pl. Dep. at 43:19-44:15.) Plaintiff does not allege that she was discriminated against while employed as a medical assistant. (Defs.' 56.1 ¶ 18; Pl.'s 56.1 ¶ 18.)

b.     *Administrative Assistant to Dr. Gulati*

On or around January 8, 2013, Plaintiff transitioned from the medical assistant position to the position of administrative assistant to Dr. Gulati. (Defs.' 56.1 ¶ 36; Pl.'s 56.1 ¶ 36.) Prior to the reassignment, Christina Rodriguez had served as Dr. Gulati's administrative assistant; before Rodriguez became Dr. Gulati's administrative assistant, she had served in Patients Medical's billing department. (Defs.' 56.1 ¶ 37; Pl.'s 56.1 ¶ 37.) According to Plaintiff, Dr. Gulati told her during a meeting on January 8, 2013, that Rodriguez was being demoted, and that Plaintiff was being promoted into the administrative assistant position. (Pl. Dep. at 52:4-15.) According to Plaintiff, Dr. Gulati also stated that she was moving Rodriguez—who was scheduled to give birth on January 19—into a cubicle, to do "random work," and that Rodriguez's pregnancy was negatively affecting her performance as Dr. Gulati's administrative assistant. (<u>Id.</u> at 51:16-18,

52:4-15, 56:25-57:14.) Rodriguez was otherwise scheduled to take maternity leave beginning on January 19, 2013. (Defs.' 56.1 ¶ 111; Pl.'s 56.1 ¶ 111.)

According to Defendants, Rodriguez was thereafter reassigned to the billing department, because claims were not being handled properly, and Rodriguez had prior experience working in Patients Medical's billing department. (Def.'s 56.1 ¶ 45; see also Dr. Gulati Dep. at 53:13-17, 95:3-18.) Upon Rodriguez's reassignment, Plaintiff observed her scanning charts and talking on the phone, but Plaintiff does not know who Rodriguez was speaking to over the telephone. (Defs.' 56.1 ¶ 41; Pl.'s 56.1 ¶ 41.) Plaintiff's only other basis (beyond speculation) for concluding that Rodriguez was not performing work for the billing department is that the cubicle to which Rodriguez was assigned was not physically located near the billing department. (Defs.' 56.1 ¶ 42; Pl.'s 56.1 ¶ 42.) Plaintiff had no knowledge of whether the billing department needed additional assistance in January 2013. (Defs.' 56.1 ¶ 43; Pl.'s 56.1 ¶ 43.) Ultimately, Rodriguez gave birth, and then returned to Patients Medical on April 15, 2013, after taking maternity leave. (Dr. Gulati Dep. at 176:14-16.) Upon Plaintiff becoming Dr. Gulati's administrative assistant, Cynthia Babylonia replaced Plaintiff as Dr. Howard's medical assistant; Babylonia also served as a sonogram technician at Patients Medical. (Defs.' 56.1 ¶ 39; Pl.'s 56.1 ¶ 39.)

Unlike the medical assistant position, which included patient contact as well as paperwork, the bulk of an administrative assistant's responsibilities involved paperwork and answering the phone. (Defs.' 56.1 ¶ 51; see also Pl. Dep. at 55:10-20.) Filling Dr. Gulati's schedule was one of Plaintiff's responsibilities as her administrative assistant. (Defs.' 56.1 ¶ 47; Pl.'s 56.1 ¶ 47.) Plaintiff understood that keeping Dr. Gulati's schedule full was a key part of her role. (Defs.' 56.1 ¶ 52; Pl.'s 56.1 ¶ 52.) Before transitioning into the role of administrative

assistant, Plaintiff was trained by Rodriguez for a day or two concerning scheduling and other administrative assistant responsibilities. (Defs.' 56.1 ¶¶ 48-49; Pl.'s 56.1 ¶¶ 48-49; see also Pl. Dep. at 54:15-18.) Plaintiff understood that calling patients who missed appointments or who needed follow-up care was one way in which to try to fill Dr. Gulati's schedule. (Defs.' 56.1 ¶ 53; see also Pl. Dep. at 77:9-78:2.) During the relevant time period, Patients Medical utilized an electronic system called "Lytec" to track and schedule appointments with doctors, as well as to note patients' insurance and billing information. (Defs.' 56.1 ¶ 50; Pl.'s 56.1 ¶ 50.) When Dr. Gulati's schedule was full, she treated approximately eight patients per day. (Defs.' 56.1 ¶ 54; Pl.'s 56.1 ¶ 54.)

The parties sharply dispute whether Dr. Gulati's schedule was full during Plaintiff's month-long tenure as administrative assistant; in addition, Plaintiff contests the authenticity of the version of Dr. Gulati's schedule submitted by Defendants in support of their motion for summary judgment. (See Dr. Gulati Lytec Reports for Dec. 2, 2013 to Mar. 9, 2013 (Abeysekera Decl., Ex. H. ("Defs.' Ex. H") (Dkt. 43-8)) at PM000387-400.) Plaintiff testified that she was able to fill Dr. Gulati's schedule during her time as administrative assistant, including filling appointments that opened due to patient cancellation.[2] (See Pl.'s 56.1 ¶ 55; Pl. Dep.

---

[2] Because the court must construe the evidence in the light most favorable to Plaintiff, the court credits Plaintiff's testimony that she filled Dr. Gulati's schedule, and that in any event, filling the schedule was not solely her responsibility as administrative assistant to Dr. Gulati.

Similarly, the court need not resolve the parties' dispute concerning the authenticity of the three purported versions of Dr. Gulati's schedule that are before the court, and given Plaintiff's own testimony, need not refer to the underlying Lytec schedules for purposes of deciding Defendants' motion for summary judgment. Accordingly, the court DENIES WITHOUT PREJUDICE Defendants' motion to strike Plaintiff's Exhibit L, and DENIES Defendants' request for sanctions. (See Dec. 5, 2014, Order; Pl.'s Dec. 10, 2014, Ltr. (Dkt. 35); Defs.' Dec. 19, 2014, Ltr. (Dkt. 39).) In advance of trial, Defendants may re-assert their motion to preclude Plaintiff's Exhibit L from evidence pursuant to Federal Rule of Civil Procedure 37(c)(1) or any other applicable rule of evidence. In addition, Plaintiff is warned that she may only introduce evidence at trial that is properly authenticated. Finally, if Defendants seek to admit any version of the Lytec schedules at trial, they should be prepared to address the discrepancies between the two versions that they produced during discovery in this case, and to explain why, in their view, Defendants' Exhibit H is the most accurate version for the relevant time period.

at 89:15-90:8.) Plaintiff also testified she understood that Penta shared responsibility for filling Dr. Gulati's schedule. (See Pl.'s 56.1 ¶ 56; Pl. Dep. at 126:15-129:11.) Dr. Gulati, however, testified that there were days in late January or early February 2013 in which she had only one or two patients on the calendar, and that she did not believe that Plaintiff effectively filled the schedule. (Defs.' 56.1 ¶ 57; Dr. Gulati Dep. at 224:5-11.) With respect to two different versions of Dr. Gulati's schedule produced by Defendants, Dr. Gulati could not explain the discrepancies in the number of appointments listed for particular days. (See generally Dr. Gulati Dep. at 26:18-50:23.) Adding to the confusion, Dr. Gulati's Lytec schedule included both patient appointments and other appointments, such as hospital visits and personal appointments. (Defs.' 56.1 ¶ 61; Dr. Gulati Dep. at 27:19-28:24.)

With respect to Plaintiff's other duties as administrative assistant to Dr. Gulati, Plaintiff failed to make complete chart entries, completed deficient paperwork, and failed to keep Dr. Gulati apprised of patients' laboratory test results. (Defs.' 56.1 ¶ 62; Dr. Gulati Dep. at 110:11-114:13.) Still, Plaintiff testified that before announcing her pregnancy, she received compliments from Penta about her performance as a medical assistant and as an administrative assistant, and from Dr. Gulati about her performance as an administrative assistant. (See Pl. Dep. at 117:19-119:10.) And Plaintiff testified that she never received any complaints from Dr. Gulati concerning her performance as an administrative assistant. (Id. at 187:21-25.) Dr. Gulati, on the other hand, testified that she spoke to Plaintiff at least once about her poor performance working with patients' prescriptions. (See Dr. Gulati Dep. at 122:25-123:7.) And Dr. Gulati testified that at some point, she informed Mr. Gulati that she was not happy with Plaintiff's overall performance as an administrative assistant, and that Plaintiff had informed her that she was not happy in her new role as an administrative assistant. (Id. at 124:17-20, 125:14-21.)

4.    Plaintiff's Pregnancy

Plaintiff first told Penta that she was pregnant on January 25, 2013.[3]  (See Pl. Dep.

at 139:9-12.)  On the same date, Plaintiff also complained to Penta about a fear of potential

discrimination based on her pregnancy (Defs.' 56.1 ¶¶ 65, 112; Pl.'s 56.1 ¶¶ 65, 112), and what

she viewed as a pattern of prior discrimination against other pregnant employees (Defs.' 56.1

¶ 112; Pl.'s 56.1 ¶ 112).  Penta thereafter informed Dr. Gulati that Plaintiff was pregnant.

(Defs.' 56.1 ¶ 113; Pl.'s 56.1 ¶ 113.)  Plaintiff alleges that Dr. Gulati began to harass her the next

day, January 26, 2013.[4]  (See Pl. Dep. at 167:5-25.)

Specifically, Plaintiff alleges the following harassment related to her pregnancy.  Before

becoming pregnant, Plaintiff was thin; when she became pregnant, her work clothes and scrubs

no longer fit her, and her stomach would show.  (Defs.' 56.1 ¶ 67; Pl.'s 56.1 ¶ 67.)  At this point,

Plaintiff was three or four months pregnant.  (Pl. Dep. at 169:22-170:6.)  Dr. Gulati asked

Plaintiff "why is your stomach showing?" and "why is your belly out?" and told Plaintiff to wear

larger scrubs that looked presentable.  (Pl.'s 56.1 ¶ 67; Pl. Dep. at 169:6-12.)  Dr. Gulati also told

Plaintiff that her appearance was "bad for business."  (Pl.'s 56.1 ¶ 67; Pl. Dep. at 170:19-20.)

Dr. Gulati told Plaintiff to wear larger clothes three-to-four times per week, for a period of two

weeks.  (Defs.' 56.1 ¶ 69; Pl.'s 56.1 ¶ 69.)

On one occasion, Plaintiff indicated that due to her morning sickness, she needed a few

minutes before returning to her desk; Dr. Gulati looked toward Plaintiff's stomach "with an evil

look" and was "nasty" toward Plaintiff.  (Defs.' 56.1 ¶ 74; Pl. Dep. at 182:18-183:2.)  Dr. Gulati

would also give Plaintiff an "evil look" when passing her in the hallway.  (Pl.'s 56.1 ¶ 74;

---

[3]  Both Defendants and Plaintiff state that Plaintiff first told Penta that she was pregnant on January 25, 2014 (see Defs.' 56.1 ¶ 64; Pl.'s 56.1 ¶ 64), but the reference to 2014 is clearly an error and is not supported by the record.

[4]  Here, again, the parties' statements of undisputed fact refer to 2014 instead of 2013.  (See Defs.' 56.1 ¶ 66; Pl.'s 56.1 ¶ 66.)

Pl. Dep. at 183:12-19.) When Plaintiff went to the bathroom, Dr. Gulati banged on the door and "rushed" Plaintiff out. (Defs.' 56.1 ¶ 71; Pl.'s 56.1 ¶ 71.)

Dr. Gulati sent Plaintiff on "errands" to bring coffee, tea, and lunch to Mr. Gulati's office every day. (Defs.' 56.1 ¶ 70; Pl.'s 56.1 ¶ 70.) Plaintiff does not know whether prior administrative assistants to Dr. Gulati, such as Rodriguez, were tasked with this particular responsibility. (Pl. Dep. at 172:10-18.) Dr. Gulati also sent Plaintiff to the file room to look for and pull patient charts, which was part of the job duties of an administrative assistant at Patients Medical. (Defs.' 56.1 ¶ 72; see also Pl. Dep. at 176:16-22.) Plaintiff believes that Dr. Gulati was requesting charts that she did not actually need, but Plaintiff does not know Dr. Gulati's reason for requesting the particular charts she requested. (Pl.'s 56.1 ¶ 72; see also Pl. Dep. at 177:2-6, 226:22-227:7.) On approximately three occasions, Dr. Gulati and Penta asked Plaintiff to lift heavy boxes full of charts that Patients Medical sought to organize. (Defs.' 56.1 ¶ 73; Pl.'s 56.1 ¶ 73; see also Pl. Dep. at 178:2-179:2.)

On the day prior to her termination, Plaintiff discovered that her nursing shoes had been cut or torn with a knife. (Defs.' 56.1 ¶ 75; Pl.'s 56.1 ¶ 75.) When Dr. Gulati saw Plaintiff looking at the shoes, she stated that Plaintiff "wouldn't be needing them any longer." (Defs.' 56.1 ¶ 76; Pl.'s 56.1 ¶ 76.)

Plaintiff believes that Patients Medical ultimately terminated her employment due to her pregnancy. (Defs.' 56.1 ¶ 77; Pl.'s 56.1 ¶ 77.) Penta herself never made any negative comments about Plaintiff's pregnancy (Defs.' 56.1 ¶ 80; Pl. Dep. at 195:24-195:2), but did state to Plaintiff during the meeting in which she told Plaintiff that her employment was terminated that "[y]ou know how it is here; you know how Dr. Gulati is with pregnant people here" (Pl.'s 56.1 ¶ 80; Pl. Dep. at 199:3-5). In addition, Penta stated to Plaintiff that she could reapply for a job at Patients

Medical once she give birth and was no longer pregnant. (Pl.'s 56.1 ¶ 80; Pl. Dep.
at 198:25-199:3.)

5.    Termination of Plaintiff's Employment

Plaintiff's final day of employment with Patients Medical was February 8, 2013, ten days

after she first announced her pregnancy. (Pl. Dep. at 108:19-21; see also Pl.'s 56.1 ¶ 115.)

During a meeting with Plaintiff, Penta informed Plaintiff that the decision to terminate her

employment originated from Dr. and Mr. Gulati. (Defs.' 56.1 ¶ 81; Pl.'s 56.1 ¶ 81.) Mr. Gulati

had instructed Penta to lay-off both Plaintiff and another employee, Cynthia Paulino.

(Defs.' 56.1 ¶ 82; Penta Dep. at 238:16-23.) Paulino served as Dr. Goforth's medical assistant

prior to his departure from the medical practice in or around December 2012. (Defs.' 56.1 ¶ 85;

Pl.'s 56.1 ¶ 85; see also Pl. Dep. at 114:6-20.) Paulino was not pregnant when her employment

was terminated. (Pl. Dep. at 114:18-20.) Patients Medical terminated the employment of both

Plaintiff and Paulino on the same day. (Defs.' 56.1 ¶ 87; Pl.'s 56.1 ¶ 87.)

Penta informed both Plaintiff and Paulino that they were being laid off due to a lack of

work. (Defs.' 56.1 ¶ 82; Penta Dep. at 241:2-5; see also Mr. Gulati Dep. at 102:17-104:3

(testifying that all laid-off employees were told either that business was slow or that Patients

Medical no longer needed their services).) Penta did not indicate that Plaintiff's performance

was a factor in her termination. (Pl.'s 56.1 ¶ 117; Pl. Dep. at 19-24; see also Feb. 8, 2013, Ltr.

from Judy Penta to Pl. (Pl.'s Mem., Ex. C (Dkt. 32-3)) at PM000204 ("Please note that effective

immediately, due to our business being slow, we must with regret lay you off. . . . We thank you

for the work you have done; in the event that the business level increases and we can use your

services we will contact you.").)

Samantha LaBarabra was thereafter reassigned from another position in the office and replaced Plaintiff as administrative assistant to Dr. Gulati.[5] (Defs.' 56.1 ¶ 84; Dr. Gulati Dep. at 141:11-18.)

### 6.     Other Former Employees

#### a.     *Brenda Brown*

Patients Medical previously employed Brenda Brown as an IV nurse. (Defs.' 56.1 ¶ 88; Pl.'s 56.1 ¶ 88.) During her employment, Brown suffered from pregnancy-related complications. (Defs.' 56.1 ¶ 89; Pl.'s 56.1 ¶ 89.) Due to those complications, Brown missed a period of work, and upon her return, was subject to some restrictions on her work responsibilities (Defs.' 56.1 ¶ 90; Penta Dep. at 120:16-122:11), including limitations on Brown's ability to stand or be on her feet (Defs.' 56.1 ¶ 91; Pl.'s 56.1 ¶ 91). Patients Medical determined that allowing Brown to perform her role as an IV nurse in her condition could endanger the safety of Brown, her child, and/or Patients Medical's patients. (Defs.' 56.1 ¶ 92; Penta Dep. at 143:9-10.) Penta communicated to Brown that while the restrictions were in place (the duration of the pregnancy), she could not work as an IV nurse for Patients Medical. (Defs.' 56.1 ¶ 93; Penta Dep. at 125:23-127:5.) Brown gave birth on October 10, 2011, attended the Patients Medical Christmas party in 2011, and returned to work at Patients Medical in February 2012. (Defs.' 56.1 ¶ 95; Penta Dep. at 163:7-24.) Brown only worked on Saturdays upon her return, as this was the only day on which she wanted to work. (Defs.' 56.1 ¶ 98; Pl.'s 56.1 ¶ 98.)

---

[5] In deciding Defendants' motion for summary judgment, the court does not consider a letter dated November 18, 2013, from LaBarabara, addressed "To Whom it May Concern." (See Abeysekera Decl., Ex. I (Dkt. 43-9).) The letter, which Defendants submitted for the truth of the matters asserted therein, is not sworn and does not comply with 28 U.S.C. § 1746 or Rule 56. See Chaiken v. VV Pub. Corp., 119 F.3d 1018, 1033 (2d Cir. 1997) (excluding unsworn expert reports); Amna v. N.Y. State Dep't of Health, No. 08-CV-2806 (CBA) (LB), 2011 WL 4592787, at *8 n.1 (E.D.N.Y. Sept. 30, 2011) (in employment discrimination action, excluding unsworn letters from plaintiff's co-workers), aff'd, 505 F. App'x 44 (2d Cir. 2012) (summary order). That the letter was apparently produced to Plaintiff during discovery does not render it admissible. (See Defs.' Reply to Pl.'s 56.1 Statement (Dkt. 44) ¶ 84.) Similarly, the court has not considered a letter from Rodriguez, also dated November 18, 2013, and also addressed "To Whom it May Concern." (See Abeysekera Decl., Ex. G (Dkt. 43-7).)

Ultimately, Brown "mutually separated" from Patients Medical in April 2012. (See Brenda Brown Exit Interview (Abeysekera Decl., Ex. J. (Dkt. 43-10)); Tr. of Dec. 11, 2013, Dep. of Rica Samaniego ("Samaniego Dep.") (Pl.'s Mem., Ex. E. (Dkt. 32-5)) at 99:6-12.)

b. <em>Rica Samaniego</em>

In or around April 2011, Patients Medical hired Rica Samaniego as a full-time employee. (Defs.' 56.1 ¶ 99; Pl.'s 56.1 ¶ 99.) Samaniego's understanding was that she would work five days per week, Tuesday through Saturday. (Samaniego Dep. at 66:14-18.) At some point in February 2012, Samaniego's hours started to be reduced, along with the hours of other employees. (Id. at 19:2-6, 68:5-25, 84:13-18.) Samaniego believed that her hours were being reduced because she was pregnant. (Id. at 64:13-24.) In March and April 2012, while pregnant, Samaniego also requested that her schedule change to three-to-four days per week, with no Saturday shifts. (Defs.' 56.1 ¶¶ 100, 104; Samaniego Dep. at 74:2-75:14.) Patients Medical subsequently changed Samaniego's employment status from full-time to part-time, effective March 15, 2012. (Defs.' 56.1 ¶ 106; Penta Dep. at 171:23-172:4.) Around this same time period, Plaintiff's employment at Patients Medical began, and Samaniego trained Plaintiff concerning how to work in the IV room and how to serve as a medical assistant to Dr. Howard. (Samaniego Dep. at 27:2-10.)

After giving birth, Samaniego informed Penta that she did not want to return to Patients Medical, and her employment was voluntarily terminated in November 2012. (Defs.' 56.1 ¶ 101; Penta Dep. at 186:2-13; Samaniego Dep. at 94:17-95:10; Rica Samaniego Exit Interview (Abeysekera Decl., Ex. L (Dkt. 43-12)); see also Defs.' 56.1 ¶ 107; Pl.'s 56.1 ¶ 107.)

7.     Plaintiff's Charge of Discrimination

Subsequent to her termination, Plaintiff filed a charge of discrimination (the "Charge of Discrimination") with the New York State Division of Human Rights and the United States Equal Employment Opportunity Commission (the "EEOC"). (See Charge of Discrimination (Abeysekera Decl., Ex. M (Dkt. 43-13)) at PM000044.) On the Charge of Discrimination, Plaintiff checked boxes indicating that she alleged discrimination based on "SEX" and "OTHER," and next to the box labeled "OTHER," specified "Pregnancy." (Id.) Plaintiff did not check a box labeled "RETALIATION." (Id.) Plaintiff also wrote the following, inter alia, on the Charge of Discrimination: "In January 2013, I notified the Office Manager, Judy Penta, that I was pregnant, a few weeks later I was fired. I am aware of two other females that were let go after notifying [Patients Medical] that they were pregnant." (Id.) On April 8, 2013, the EEOC issued to Plaintiff a Notice of Right to Sue. (Id. at PM00048.)

**B.     Procedural History**

Plaintiff filed her Complaint on May 8, 2013. (Compl.) Defendants filed an Answer on June 18, 2013. (Answer (Dkt. 6).) Discovery proceeded before Magistrate Judge Roanne L. Mann. At the close of discovery, Defendants requested leave to file a motion for summary judgment (see Defs.' Ltr. for Pre-Mot. Conference (Dkt. 21)), which the court granted during a pre-motion conference (see June 2, 2014, Min. Entry).

**II.     LEGAL STANDARD**

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). No genuine dispute of material fact exists if "the

record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co., v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). In evaluating a motion for summary judgment, the court "is required to construe the evidence in the light most favorable to the non-moving party and to draw all reasonable inferences in its favor." Trammell v. Keane, 338 F.3d 155, 161 (2d Cir. 2003); see also Anderson, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").

The moving party bears the initial burden to show an absence of genuine factual dispute. See Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970). Summary judgment will be granted if the opposing party then "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). To defeat summary judgment, the opposing party must do more than demonstrate "some metaphysical doubt as to the material facts," Matsushita, 475 U.S. at 586, and may not rely on "conclusory allegations," Twin Labs., Inc. v. Weider Health & Fitness, 900 F.2d 566, 568 (2d Cir. 1990).

## III.   DISCUSSION

Plaintiff's claims fall into three broad categories: (1) pregnancy discrimination related to her termination; (2) retaliation related to her complaint to Penta about pregnancy discrimination; and (3) hostile work environment. For each category of claims, Plaintiff asserts causes of action under Title VII, the NYSHRL, and the NYCHRL.

### A.   Pregnancy Discrimination

Because there are genuine issues of material fact, Defendants' motion for summary judgment on Plaintiff's pregnancy discrimination claims under Title VII, the NYSHRL, and the NYCHRL is DENIED.

## 1. Title VII and NYSHRL

Title VII prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1); see also id. § 2000e-2(m) ("[A]n unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice."). The Pregnancy Discrimination Act of 1978 amended Title VII to provide that discrimination "because of" an individual's sex includes discrimination "on the basis of pregnancy, childbirth, or related medical conditions," and that "women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes . . . ." Id. § 2000e(k).

Pregnancy discrimination claims brought under Title VII are analyzed pursuant to the three-step, burden-shifting framework first set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Kerzer v. Kingly Mfg., 156 F.3d 396, 400-01 (2d Cir. 1998). "Under this framework, the plaintiff first must establish, by a preponderance of the evidence, a prima facie case of discrimination." Id. at 401. "A plaintiff can establish a prima facie case of pregnancy discrimination under Title VII by showing that: (1) she is a member of a protected class; (2) she satisfactorily performed the duties required by the position; (3) she was discharged; and (4) her position remained open and was ultimately filled by a non-pregnant employee." Id. (internal quotation marks and citation omitted). "Alternatively, a plaintiff may establish the fourth element of a prima facie case by demonstrating that the discharge occurred in circumstances giving rise to an inference of unlawful discrimination." Id. (citations omitted). "A plaintiff's burden to establish a prima facie case of discrimination is de minimis." Id.

"If the plaintiff demonstrates a prima facie case, a presumption that the employer unlawfully discriminated against the employee is raised, and the burden of production then shifts to the employer to articulate a legitimate, clear, specific and non-discriminatory reason for discharging the employee." Id. (internal quotation marks and citation omitted). "If the employer satisfies this burden, the presumption raised by the establishment of the prima facie case is rebutted, and the burden is then on the plaintiff to show by a preponderance of the evidence that the employer's stated reason was merely a pretext for discrimination." Id. (citation omitted). "An employer's reason for termination cannot be proved to be a pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason. Id. (citations omitted). "In the summary judgment context, this means that the plaintiff must establish a genuine issue of material fact either through direct, statistical or circumstantial evidence as to whether the employer's reason for discharging her is false and as to whether it is more likely that a discriminatory reason motivated the employer to make the adverse employment decision." Id. (internal quotation marks and citation omitted).

Pregnancy discrimination claims brought under the NYSHRL are analyzed under the same standard as Title VII claims.[6] DeMarco v. CooperVision, Inc., 369 F. App'x 254, 255 (2d Cir. 2010) (summary order); see also Ramos v. Piller, Inc., No. 07-CV-4047 (SCR) (JFK), 2009 WL 3401261, at *3 (S.D.N.Y. Oct. 21, 2009) (citing cases).

---

[6] Pregnancy discrimination claims brought under the NYCHRL are analyzed under a different framework. See infra Part III.A.2.

a. *Prima Facie Case*

Defendants argue that Plaintiff cannot establish the fourth element of a prima facie case—that she was terminated under circumstances giving rise to an inference of discrimination.[7] (See Mem. of Law in Supp. of Defs.' Mot. for Summ. J. ("Defs.' Mem.") (Dkt. 42) at 4-17.) Plaintiff counters that there is sufficient evidence to meet her minimal, initial burden. (See Pl.'s Mem. at 9-15.)

The court finds that Plaintiff has established a prima facie case of pregnancy discrimination. Plaintiff's employment was terminated a mere two weeks after she first announced her pregnancy. See Briggs v. Women in Need, Inc., 819 F. Supp. 2d 119, 128 (E.D.N.Y. 2011) (explaining that "[t]emporal proximity between the plaintiff's termination and her pregnancy, childbirth, or related medical condition can raise an inference of discrimination" when accompanied by other circumstantial evidence). Here, in addition to the temporal proximity of the termination, when viewed in the light most favorable to Plaintiff, the record reflects that during the meeting in which Plaintiff was terminated, Penta stated, "[y]ou know how it is here; you know how Dr. Gulati is with pregnant people here." And—again, viewing the record in the light most favorable to Plaintiff—the record reflects that Dr. Gulati informed Plaintiff that she demoted her prior assistant due, at least in part, to pregnancy, made comments to Plaintiff regarding her own pregnancy, and changed her attitude toward Plaintiff in response to Plaintiff's announcement that she was pregnant. These facts are sufficient to meet Plaintiff's

---

[7] Defendants also argue in a footnote that Plaintiff cannot meet the second element of the prima facie case—that she was qualified for the administrative assistant position. (See Defs.' Mem. at 5 n.3.) Defendants' real argument, however, is that Plaintiff performed the administrative assistant role poorly, and Defendants make this argument to support their claim that Plaintiff's termination was for legitimate, non-discriminatory reasons that were not pretext. (Indeed, it was Defendants who reassigned Plaintiff into the administrative assistant role in the first place—apparently in their view, she was qualified for the position as of January 8, 2013.) The court will therefore consider evidence related to Plaintiff's performance as an administrative assistant in its analysis at the second and third stages of the McDonnell Douglas framework.

initial burden.[8] See, e.g., Quarantino v. Tiffany & Co., 71 F.3d 58, 65 (2d Cir. 1995) (plaintiff established that termination occurred under circumstances giving rise to an inference of discrimination where, inter alia, attitude of plaintiff's supervisor changed after announcement of pregnancy); Zambrano-Lamhaouhi v. N.Y.C. Bd. of Educ., 866 F. Supp. 2d 147, 170-71 (E.D.N.Y. 2011) (holding that plaintiff met initial burden based on evidence, inter alia, that supervisor exhibited hostility toward her pregnancy and monitored her bathroom usage); Behringer v. Lavelle Sch. for the Blind, No. 08-CV-4899 (JGK), 2010 WL 5158644, at *11 (S.D.N.Y. Dec. 17, 2010) (plaintiff established prima facie case by showing temporal proximity between disclosing her disability and adverse employment actions); Koppenal v. Nepera, Inc., 74 F. Supp. 2d 409, 412-13 (S.D.N.Y. 1999) (plaintiff established prima facie case by pointing to negative comments made by employer about her pregnancy).

b.    *Legitimate, Non-Discriminatory Justifications*

Defendants offer two justifications for Plaintiff's termination: (1) Patients Medical was suffering financially, necessitating employee lay-offs, and (2) Plaintiff performed poorly as an administrative assistant to Dr. Gulati. (See Defs.' Mem. at 5-11; Reply Mem. of Law in Further Support of Defs.' Mot. for Summ. J. ("Defs.' Reply") (Dkt. 45) at 5-8.) There is evidence in the record to support these asserted justifications; for example, Plaintiff's termination letter informed her that her employment was terminated because business was slow; Dr. and Mr. Gulati each

---

[8]  Plaintiff alternatively argues that she has satisfied the fourth element of her prima facie case by showing that Defendants did not eliminate the role of administrative assistant to Dr. Gulati upon Plaintiff's termination, and in fact filled the administrative assistant position with a non-pregnant replacement. (See Pl.'s Mem. at 10.) Defendants argue that they reassigned a current employee to replace Plaintiff, rather than hire someone new, and also argue that the replacement had twice been pregnant while employed at Patients Medical, but fail to support this assertion with admissible evidence, see supra note 5. (Reply Mem. of Law in Further Support of Defs.' Mot. for Summary J. (Dkt. 45) at 5-7.) Defendants also argue that Plaintiff's prior position of medical assistant to Dr. Roberts and Dr. Howard was eliminated when those doctors resigned or significantly reduced their schedules. (Id. at 7.) Because Plaintiff has met her initial burden by submitting evidence showing that her termination occurred under circumstances giving rise to an inference of discrimination, the court need not decide whether Plaintiff also met her burden under the fourth element's alternative formulation.

testified that the practice was struggling financially in 2012 and 2013; and Dr. Gulati testified that she was unhappy with Plaintiff's performance overall as an administrative assistant.

      c.    *Pretext*

Plaintiff argues that Defendants' proffered reasons for her termination are pretextual. Among other contentions, Plaintiff argues that: (1) Mr. Gulati's explanation that he intended to terminate Plaintiff's employment in late December 2012 or early January 2013 before temporarily transferring her into the administrative assistant position is not supported by the record and defies logic; (2) business at Patients Medical was not slow, and Patients Medical hired both someone to replace Plaintiff as a medical assistant and someone to replace Plaintiff as administrative assistant to Dr. Gulati; (3) Defendants cannot support their contention that Plaintiff's employment was terminated as a larger effort to reduce employee numbers, since all other employees who were terminated had disciplinary issues or were assigned to doctors who were leaving the practice; and (4) Plaintiff's performance as a medical assistant, and later as an administrative assistant, was strong—indeed, Plaintiff argues, Defendants never warned her about her performance before terminating her employment, and never cited her poor performance as a reason for her termination.[9] (See Pl.'s Mem. at 15-21.) In addition, Plaintiff points to what she characterizes as "a pattern of discrimination at Patients Medical, whereby women are mistreated and either forced out or terminated." (Id. at 12-15.)

The court finds that a jury could reasonably find that Defendants' justifications for the termination are pretextual—in other words, that sex/pregnancy discrimination was a motivating factor in the decision to terminate Plaintiff's employment—and therefore Defendants' motion for

---

[9] As discussed above, see supra note 2, Plaintiff also argues that the schedules reflecting Dr. Gulati's appointments during Plaintiff's tenure as administrative assistant show that Plaintiff was as effective at filling the calendar as prior administrative assistants. For purposes of Defendants' motion for summary judgment, the court has credited Plaintiff's own testimony that she filled Dr. Gulati's calendar, and therefore has not considered the purported "true" schedules submitted by Plaintiff, or the version of the schedule submitted by Defendants.

summary judgment on Plaintiff's pregnancy discrimination claims under Title VII and the NYSHRL is denied.

With respect to their first justification, Defendants are correct that "terminations as part of a broader restructuring process motivated by financial concerns satisfy a defendant's burden to establish a legitimate, non-discriminatory business justification for an adverse action." (Defs.' Mem. at 6 (citing <u>Parcinski v. Outlet Co.</u>, 673 F.2d 34, 37 (2d Cir. 1982)).) Here, Defendants presented evidence that business was slow due to the departures or reductions in scheduling of several doctors, and that Patients Medical risked failing to meet its payroll obligations.

On the other hand, "even during a legitimate reorganization or workforce reduction, an employer may not dismiss employees for unlawful discriminatory reasons." <u>Maresco v. Evans Chemetics</u>, 964 F.2d 106, 111 (2d Cir. 1992) (internal quotation marks and citation omitted). During the same time period that Defendants argue Patients Medical was forced to lay-off employees,[10] it also attempted to add doctors and staff to provide new services.[11] Moreover, while Plaintiff's position as a medical assistant may have been eliminated (a contention that Plaintiff disputes), all parties agree that Dr. Gulati required an administrative assistant even after Plaintiff's termination, Patients Medical's financial status notwithstanding. In addition, although Mr. Gulati testified that he made the decision to terminate Plaintiff's employment in late December 2012, while she was still a medical assistant, the record (viewed in the light most

---

[10] Although Defendants refer to a broad reduction in force and to Mr. Gulati's testimony that he determined in late December 2012 that 10-15 employees would need to be laid off in 2013, they in fact only point to the termination of Paulino (on the same day as Plaintiff) to support their reduction-in-force argument. (<u>See</u> Defs.' Mem. at 8-9; Defs.' Reply at 6-7.) Defendants' actions with respect to another employee on the same day as Plaintiff may be probative evidence that Plaintiff's termination was not, in fact, discriminatory, but it does not compel summary judgment in Defendants' favor in light of the record as a whole.

[11] The court considers testimony provided by Dr. Gulati (and others) that in the wake of poor financial results, Patients Medical expanded its practices and hired new doctors and staff to service those practices. However, for purposes of this motion, it does not consider Plaintiff's testimony that business was "booming," as she has failed to show that she has personal knowledge of Patients Medical's financial performance.

favorable to Plaintiff) reflects that Plaintiff was told that the change to administrative assistant was a promotion; at the time, Defendants did not, for example, explain to Plaintiff that she was being temporarily reassigned in order to delay her eventual termination due to a reduction in force. Similarly, the record reflects that Dr. Gulati indicated to Plaintiff that she would permanently replace her prior assistant, rather than serving only as a temporary assistant during the prior assistant's upcoming maternity leave. Given the overall circumstances of Plaintiff's reassignment to administrative assistant, a jury could find that Defendants' justification that business was slow is a pretext for a discriminatory employment action. See, e.g., Koppenal, 74 F. Supp. 2d at 414 (denying motion for summary judgment because "the fact that plaintiff's position was not eliminated creates a material issue of fact as to whether defendants' claim that plaintiff was fired as part of a reduction in force is a pretext for pregnancy discrimination"); Sigmon v. Parker Chapin Flattau & Klimpl, 901 F. Supp. 667, 678 (S.D.N.Y. 1995) (holding that jury could reasonably find that defendant's explanation that plaintiff's termination was part of an otherwise applicable reduction in force was a pretext for discrimination).

With respect to Defendants' second justification—that Plaintiff performed poorly as an administrative assistant—the court again concludes that a jury could reasonably find that this explanation is pretextual. The undisputed record reflects that Plaintiff performed adequately (or superiorly) as a medical assistant, even earning employee of the month on one occasion. With respect to her performance as an administrative assistant, the court must view the record in the light most favorable to Plaintiff. When viewed in such a light, the record shows that Plaintiff did an acceptable job as administrative assistant, and even received compliments from Dr. Gulati and Penta. Defendants argue that they terminated Plaintiff's employment a mere month into her new role as administrative assistant because she could not keep Dr. Gulati's schedule full. But even

viewing the record in a light favorable to Defendants, they cite only one meeting between Dr. Gulati and Plaintiff concerning her performance (and during which Dr. Gulati's calendar was not even discussed), and reference no formal discipline of Plaintiff or patient complaints. See Carlton v. Mystic Transp., Inc., 202 F.3d 129, 137 (2d Cir. 2000) (genuine issue of material fact existed concerning defendants' justification of poor performance where the plaintiff "never received a negative written performance evaluation or formal warning, nor is there any writing whatsoever criticizing his job performance, indicating that as a reason for his firing poor job performance was an afterthought"); see also, e.g., Smith v. K&F Indus., Inc., 190 F. Supp. 2d 643, 650 (S.D.N.Y. 2002) ("A lack of written warning, disciplinary action or reprimand is evidence that may rebut a defendant's asserted legitimate, non-discriminatory rationale.").

Moreover, in the very letter in which it formally communicated Plaintiff's termination, Patients Medical wrote: "Please note that effective immediately, due to our business being slow, we must with regret lay you off. . . . We thank you for the work you have done; in the event that the business level increases and we can use your services we will contact you." That Defendants were willing to re-hire Plaintiff at some point in the future could be viewed by a jury as probative evidence that Defendants' justification that Plaintiff performed poorly is pretextual. Indeed, the record, when viewed in the light most favorable to Plaintiff, reflects that Penta also orally told Plaintiff upon communicating her termination, "[y]ou know how it is here; you know how Dr. Gulati is with pregnant people here," and that Plaintiff could reapply for a job at Patients Medical once she give birth and was no longer pregnant. See Roge v. NYP Holdings, Inc., 257 F.3d 164, 170 (2d Cir. 2001) ("We agree that a jury issue on the question of pretext may be created when an employer offers inconsistent and varying explanations for its decision to terminate a plaintiff."); Carlton, 202 F.3d at 137 (affirming denial of motion for summary

judgment where defendant offered inconsistent justifications to EEOC and to the district court); Quartey v. Schiavone Constr. Co., No. 11-CV-2037 (DLI) (CLP), 2014 WL 1276476, at *6 (E.D.N.Y. Mar. 27, 2014) (denying motion for summary judgment where jury could credit the plaintiff's testimony that two individuals associated with employer gave "materially inconsistent explanations" for decision to termination him). Here, not only have Defendants offered a justification in this litigation that they did not assert at the time they terminated Plaintiff's employment (her poor performance), Plaintiff has offered testimony (taken as true for purposes of this motion) that Penta in fact previously offered a discriminatory justification—Plaintiff's recently announced pregnancy.

The parties dispute whether the factual record reflects that three other Patients Medical employees—Rodriguez, Brown, and Samaniego—were subjected to pregnancy discrimination prior to Plaintiff's termination, or whether their experiences in fact show an employer that "has a history of accommodating its employees' pregnancies." (Defs.' Mem. at 12.) Because Plaintiff has raised a genuine issue of material fact without the court considering these other employees' experiences, the court need not delve deeply into the factual record in order to deny Defendants' motion for summary judgment on the pregnancy discrimination claims. The court does note that only one of the three employees appears to have been deposed in this action,[12] and that Plaintiff's knowledge of the other employees' experiences may be based more on speculation than on personal knowledge. Still, the court credits, for purposes of this motion, Plaintiff's testimony that Dr. Gulati told her during a meeting just before she started as administrative assistant that Rodriguez was being demoted, and that Rodriguez's pregnancy was negatively affecting her performance as an administrative assistant. Generally, however, evidence related to other

---

[12] Defendants also submitted a letter from one of these employees in support of their motion, but as discussed above, the letter is unsworn and inadmissible. See supra note 5.

employees' experiences is not material to the court's resolution of Defendants' motion, and the court does not resolve in this Memorandum and Order whether evidence related to alleged discrimination against, or alleged accommodations in favor of, other Patients Medical employees is relevant and admissible at trial.

To summarize: Defendants have offered two legitimate, non-discriminatory justifications for their decision to terminate Plaintiff's employment, but Plaintiff has offered sufficient evidence from which a jury could infer that these justifications are a pretext for sex/pregnancy discrimination, and that discrimination was a motivating factor in the decision to terminate Plaintiff's employment. Of course, the jury may, or may not, accept Defendants' proffered justifications at trial.

### 2. NYCHRL

The court must analyze Plaintiff's NYCHRL claim "separately and independently" from her federal and state law claims. Velazco v. Columbus Citizens Found., 778 F.3d 409, 410 (2d Cir. 2015) (per curiam). This is because the NYCHRL, as amended by the New York City Council in 2005, must "be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal or New York State civil and human rights laws, including those laws with provisions comparably-worded to provisions of this title, have been so construed." N.Y.C. Admin. Code § 8-130; see generally Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 108-110 (2d Cir. 2013) (describing amendments to NYCHRL that require district courts no longer to construct the NYCHRL "to be coextensive with its federal and state counterparts"). Because the NYCHLR is construed more liberally than its federal and state counterparts, the independent analysis "problem" that federal district courts often face is not implicated here, where the court has determined that Plaintiff's

Title VII and NYSHRL claims survive Defendants' motion for summary judgment. In any event, the court also holds that genuine issues of material fact preclude dismissal of Plaintiff's pregnancy discrimination claim under the NYCHRL.

The NYCHRL makes it "an unlawful discriminatory practice . . . [f]or an employer or an employee or agent thereof, because of the actual or perceived . . . gender . . . of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment." N.Y.C. Admin. Code § 8-107(1)(a). "To establish a gender discrimination claim under the NYCHRL, the plaintiff need only demonstrate 'by a preponderance of the evidence that she has been treated less well than other employees because of her gender.'" Mihalik, 715 F.3d at 110 (quoting Williams v. N.Y.C. Hous. Auth., 872 N.Y.S.2d 27, 39 (App. Div. 2009)); see also, e.g., E.E.O.C. v. Bloomberg L.P., 967 F. Supp. 2d 816, 849-50 (S.D.N.Y. 2013) (analyzing whether totality of the circumstances indicated that plaintiff was "treated less well than other employees" on account of her pregnancy and her return from maternity leave). "Even if the plaintiff establishes that she was treated 'less well' because of her gender, defendants may assert 'an affirmative defense whereby [they] can still avoid liability if they prove that the conduct complained of consists of nothing more than what a reasonable victim of discrimination would consider petty slights and trivial inconveniences.'" Mihalik, 715 F.3d at 111 (quoting Williams, 872 N.Y.S.2d at 41). "In evaluating both the plaintiff's claim and the defendant's affirmative defense, courts must consider the 'totality of the circumstances.'" Id. (quoting Hernandez v. Kaisman, 957 N.Y.S.2d 53, 59 (App. Div. 2012)). A defendant presenting evidence of legitimate, non-discriminatory justifications for the employment action "is entitled to summary judgment on this basis only if the record establishes as a matter of law that

26

'discrimination play[ed] no role' in its actions."[13] Mihalik, 715 F.3d at 110 n.8 (alteration in original) (quoting Williams, 872 N.Y.S.2d at 40 n.27).

Here, viewing the record in the light most favorable to Plaintiff, a jury could reasonably find based on a totality of the circumstances that Plaintiff was treated "less well" because of her gender—i.e., her pregnancy played a role in Defendants' decision to terminate her employment.[14] See, e.g., Kia Song Tang v. Glocap Search LLC, No. 14-CV-1108 (JMF), 2015 WL 1344788, at *5 (S.D.N.Y. Mar. 24, 2015) (denying summary judgment on Title VII and NYCHRL claims where jury could find that the defendants' justifications that they needed to cut costs and that the plaintiff was no longer effective at her job were pretextual); Bloomberg, 967 F. Supp. 2d at 849-50.

**B.    Retaliation**

Plaintiff also alleges that Defendants retaliated against her for engaging in a protected activity. The court GRANTS Defendants' motion for summary judgment on Plaintiff's Title VII retaliation claim, but DENIES Defendants' motion for summary judgment on Plaintiff's NYSHRL and NYCHRL retaliation claims.

1.    Title VII

"It is well established that Title VII requires a plaintiff to exhaust administrative remedies before filing suit in federal court." Fowlkes v. Ironworkers Local 40, 790 F.3d 378, 384

---

[13] The Second Circuit has noted that it is an open question whether, or to what extent, the McDonnell Douglas burden-shifting framework still applies to NYCHLR claims. Id. (collecting cases). In any event, a defendant's evidence of a non-discriminatory justification for the employment action is relevant no matter the analytical framework applied to the plaintiff's substantive claim. For purposes of this motion for summary judgment, the court need not decide whether the McDonnell Douglas burden-shifting framework applies to Plaintiff's NYCHRL claim.

[14] In their moving brief, Defendants request that the court decline to exercise supplemental jurisdiction over Plaintiff's NYSHRL and NYCHRL claims, assuming the court would first dismiss all federal claims. (See Defs.' Mem. at 3-4.) Because the court has denied Defendants' motion for summary judgment on Plaintiff's Title VII pregnancy discrimination claim, Defendants' request is denied. The court exercises its jurisdiction over Plaintiff's NYSHRL and NYCHRL claims pursuant to 28 U.S.C. § 1367(a).

(2d Cir. 2015); see also Ragone v. Atl. Video at Manhattan Ctr., 595 F.3d 115, 126

(2d Cir. 2010) (citing 42 U.S.C. § 2000e5(e), (f)). "The purpose of this exhaustion requirement

is to give the administrative agency the opportunity to investigate, mediate, and take remedial

action." Fowlkes, 790 F.3d at 384 (quoting Brown v. Coach Stores, Inc., 163 F.3d 706, 712

(2d Cir. 1998)). Thus, "[t]o bring a claim under Title VII, a plaintiff must first have filed a

complaint with the [EEOC] or a state equivalent." Burgis v. N.Y.C. Dep't of Sanitation, ---

F.3d ---, 2015 WL 4590507, at *4 (2d Cir. July 31, 2015); see also Fowlkes, 790 F.3d at 384

("'Exhaustion of administrative remedies through the EEOC is an essential element of the

Title VII . . . statutory scheme[],' accordingly, it is 'a precondition to bringing such claims in

federal court.'" (quoting Legnani v. Alitalia Linee Aeree Italiane, S.P.A., 274 F.3d 683, 686

(2d Cir. 2001))).

Although "[e]xhaustion is ordinarily 'an essential element' of a Title VII claim,"

Williams v. N.Y.C. Hous. Auth., 458 F.3d 67, 70 (2d Cir. 2006) (quoting Legnani, 274 F.3d

at 686), "[c]laims not raised in an EEOC complaint . . . may be brought in federal court if they

are 'reasonably related' to the claim filed with the agency," id. (quoting Butts v. City of N.Y.

Dep't of Hous. Pres. & Dev., 990 F.2d 1397, 1401 (2d Cir. 1993)).[15] As the Second Circuit has

explained:

> This [court] has recognized that "[a] claim is considered
> reasonably related if the conduct complained of would fall within
> the scope of the EEOC investigation which can reasonably be
> expected to grow out of the charge that was made." Fitzgerald v.
> Henderson, 251 F.3d 345, 359-60 (2d Cir. 2001) (internal
> quotation marks omitted). In this inquiry, "the focus should be 'on
> the factual allegations made in the [EEOC] charge itself,
> describing the discriminatory conduct about which a plaintiff is
> grieving.'" Deravin v. Kerik, 335 F.3d 195, 201 (2d Cir. 2003)

---

[15] Plaintiff does not assert the two other bases that could excuse the exhaustion requirement: (1) an allegation of retaliation in response to the filing of an EEOC charge of discrimination, or (2) further incidents of discrimination carried out in the same manner alleged in an EEOC charge. See Butts, 990 F.3d at 1402-03.

(quoting <u>Freeman v. Oakland Unified Sch. Dist.</u>, 291 F.3d 632, 637 (9th Cir. 2002)). The central question is whether the complaint filed with the EEOC gave that agency "adequate notice to investigate discrimination on both bases." <u>Id.</u> at 202. The "reasonably related" exception to the exhaustion requirement "'is essentially an allowance of loose pleading' and is based on the recognition that 'EEOC charges frequently are filled out by employees without the benefit of counsel and that their primary purpose is to alert the EEOC to the discrimination that a plaintiff claims [he] is suffering.'" <u>Id.</u> at 201 (quoting <u>Butts</u>, 990 F.2d at 1402) (alteration in original).

<u>Id.</u> at 70 (footnote omitted).

Here, Plaintiff did not check the box labeled "RETALIATION" on her Charge of Discrimination. Although "merely checking a box, or failing to check a box does not necessarily control the scope of the charge," <u>see</u> <u>Cooper v. Xerox Corp.</u>, 994 F. Supp. 429, 436 (W.D.N.Y. 1998), the absence of a checkmark weighs against concluding that the plaintiff has alleged discrimination on the basis of the claim designated by that box. <u>See, e.g.</u>, <u>Hurt v. Donahoe</u>, No. 07-CV-4201 (ENV) (LB), 2011 WL 10526984, at *4 (E.D.N.Y. Feb. 24, 2011), <u>aff'd</u>, 464 F. App'x 40, 41 (2d Cir. 2012) (summary order).

Still, "[t]he more critical analysis is whether there is any explanation or description supporting a particular claim." <u>Cooper</u>, 994 F. Supp. at 436; <u>see also</u> <u>Alonzo v. Chase Manhattan Bank, N.A.</u>, 25 F. Supp. 2d 455, 458 (S.D.N.Y. 1998) ("[I]t is the substance of the charge and not its label that controls."). <u>Compare</u> <u>Trivedi v. N.Y.S. Unified Court Sys. Office of Court Admin.</u>, 818 F. Supp. 2d 712, 722-23 (S.D.N.Y. 2011) (adopting report and recommendation) (where formal EEOC charge "lacked any substantive allegations about religion or gender," those claims were not reasonably related to claims based on race, color, and national origin stemming from use of new English-language test for court interpreters), <u>Hurt</u>, 2011 WL 10526984, at *4 (where EEOC charge described events relating only to plaintiff's disability as a result of knee injury, and was "devoid of any reference to race

29

discrimination, gender discrimination, or retaliation, or any facts that could be construed as raising those issues," those claims were unexhausted), with Williams, 458 F.3d at 71 (allegations in plaintiff's complaint were sufficient to put EEOC on notice of potential sex discrimination claim where she indicated that: she was the only woman in her station; she had previously alleged gender discrimination in state court; an alleged sexual harasser was reinstalled as her boss; she was given an "impossible" assignment never given to men; and she was deprived of private changing facilities and given no option but to change with male co-workers).

Here, Plaintiff's Charge of Discrimination failed to put the EEOC on notice of a claim of retaliation. In the Charge of Discrimination, Plaintiff stated, inter alia, that "[i]n January 2013, I notified the Office Manager, Judy Penta, that I was pregnant, a few weeks later I was fired. I am aware of two other females that were let go after notifying [Patients Medical] that they were pregnant." The Charge includes no reference to Plaintiff's contention that she expressed concerns to Penta that she would be discriminated against on the basis of her pregnancy, or any description of engaging in a protected activity. (Compare Charge of Discrimination, with Compl. ¶¶ 16-18.) Under these circumstances, Plaintiff's claim of retaliation is not "reasonably related" to her underlying claim of pregnancy discrimination. See, e.g., Foxworth v. Am. Bible Soc'y, No. 03-CV-3005 (MBM), 2005 WL 1837504, at *3, 10-12 (S.D.N.Y. July 28, 2005) (granting summary judgment on retaliation claim where plaintiff alleged in EEOC charge only that her position was eliminated on the basis of her race and sex, but did not allege, as she later did in her civil complaint, that she previously complained to management about her treatment), aff'd sub nom. Mitchell-Foxworth v. Am. Bible Soc'y, 180 F. App'x 294, 294 n.1 (2d Cir. 2006) (summary order); Chinn v. City Univ. of N.Y. Sch. of Law at Queens Coll., 963 F. Supp. 218, 222-24 (E.D.N.Y. 1997) (dismissing retaliation claim where plaintiff alleged in EEOC charge

that his reassignment and discharge were motived by racial discrimination, but did not put EEOC on notice of his history of activism against defendant for its allegedly discriminatory practices).

Plaintiff argues that the EEOC's investigation would have uncovered her retaliation claim, since "her complaint to [Penta] about a pattern of discrimination (protected activity) is reasonably related to her charge, alleging the same pattern of discrimination against other women and herself." (Pl.'s Mem. at 23 n.38.) Plaintiff offers no support for this assertion, and based on the limited information included in the Charge of Discrimination, the court does not agree. See, e.g., Cordoba v. Beau, No. 02-CV-4951, 2003 WL 22902266, at *10 (S.D.N.Y. Dec. 8, 2003) ("[T]he EEOC's investigation into national origin and age discrimination claims cannot be expected to evolve into an investigation of retaliatory motive."); Chinn, 963 F. Supp. at 223 ("The EEOC had every reason to believe that [plaintiff's] complaint was confined to allegations of racial discrimination, in the limited context of his reassignment and discharge. [Plaintiff's] Title VII retaliation claims present both a new legal theory, namely retaliation, and new factual allegations, namely his long-time criticism of [defendant's] treatment of minorities."). Under Plaintiff's overbroad interpretation of the "reasonably related" framework, almost any charge of discrimination that alleged a wrongful termination on the basis of a protected characteristic would put the EEOC on notice of a parallel retaliation claim; this is not an accurate statement of the law in this circuit. Accordingly, Plaintiff's Title VII retaliation claim against Patients Medical is dismissed for failure to exhaust administrative remedies.

2.    NYSHRL

The NYSHRL provides that "[i]t shall be an unlawful discriminatory practice . . . [f]or any employer . . . to discharge, expel or otherwise discriminate against any person because he or she has opposed any practices forbidden under this article or because he or she has filed a

complaint, testified or assisted in any proceeding under this article." N.Y. Exec. Law § 296(1)(e). Unlike Title VII, the NYSHRL does not require a plaintiff to exhaust administrative remedies prior to bringing a civil action. See Ross-Caleb v. City of Rochester, 512 F. App'x 17, 18-19 (2d Cir. 2013) (summary order).

The McDonnell Douglas burden-shifting framework applies to retaliation claims under the NYSHRL. See Zann Kwan v. Andalex Grp. LLC, 737 F.3d 834, 845-47 (2d Cir. 2013). To establish a prima facie case of unlawful retaliation, a plaintiff must show "(1) participation in a protected activity; (2) the defendant's knowledge of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." Id. at 844 (internal quotation marks and citation omitted). If the employer puts forward a non-retaliatory reason for the employment action, the plaintiff must then put forward evidence that the non-retaliatory reason is a mere pretext for retaliation. See id. at 845.

It is now an open question whether a plaintiff asserting a NYSHRL retaliation claim ultimately must show that retaliation was a "but-for" cause for the adverse employment action— as required for Title VII retaliation claims under the Supreme Court's decision in University of Texas Southwestern Medical Center v. Nassar, 133 S. Ct. 2517 (2013)—or rather, must show only that retaliation was a substantial or motivating factor for the employer's decision. The Second Circuit has recognized that it is an open question whether the Supreme Court's reasoning in Nassar applies to retaliation claims brought under the NYSHRL. See Zann Kwan, 737 F.3d at 847 n.7 ("Because the plaintiff's claims survive under the Nassar 'but-for' standard, we do not decide whether the NYSHRL claim is affected by Nassar, which by its terms dealt only with retaliation in violation of Title VII."); see also, e.g., Hexemer v. Gen. Elec. Co., No. 12-CV-1808 (LEK) (CFH), 2015 WL 3948418, at *6 & n.1 (N.D.N.Y. June 29, 2015) (noting lack of clear

32

precedent). Even where a but-for standard of causation applies (such as for Title VII retaliation claims), "[r]equiring proof that a prohibited consideration was a 'but-for' cause of an adverse action does not equate to a burden to show that such consideration was the 'sole' cause." Zann Kwan, 737 F.3d at 846 & n.5. Rather, under a but-for regime, the plaintiff must "prove[] by a preponderance of the evidence that she did in fact complain about discrimination and that she would not have been terminated if she had not complained about discrimination." Id. at 846 n.5.

In their summary judgment briefing, the parties dedicate little analysis to the specific NYSHRL retaliation claim, and do not address the degree of causation that Plaintiff must ultimately show. Because the Second Circuit has not held that Nassar's reasoning applies to NYSHRL retaliation claims, the court applies the motivating-factor standard of causation to Plaintiff's claim; in any event, the court concludes that Plaintiff's claim would survive summary judgment even under a but-for standard of causation.

On the merits, Defendants argue that even if Plaintiff could establish a prima facie case of retaliation, she cannot rebut Defendants' non-retaliatory reasons for her termination. (See Defs.' Mem. at 24.) However, for many of the reasons discussed above in connection with Plaintiff's pregnancy discrimination claim under Title VII and the NYSHRL, see supra Part III.A.1, genuine issues of material fact preclude summary judgment.

Plaintiff has established a prima facie case. In brief, she has put forward evidence tending to show that (1) she participated in a protected activity when she voiced her concerns about pregnancy discrimination to Penta, a senior manager at Patients Medical who reported directly to Dr. and Mr. Gulati and who appears to have handled human resources-related issues; (2) Defendants were aware of Plaintiff's complaint; (3) Plaintiff's employment was terminated; and (4) a causal connection exists between the protected activity (the complaint) and the adverse

employment action (the termination). To engage in "protected activity," a plaintiff "need only have had a good faith, reasonable belief that he was opposing an employment practice made unlawful . . . ." Kessler v. Westchester Cnty. Dep't of Soc. Servs., 461 F.3d 199, 210 (2d Cir. 2006) (internal quotation marks and citation omitted). Indeed, "[i]nformal complaints to management as to discrimination on a basis prohibited by Title VII are protected activity." Amin v. Akzo Novel Chems., Inc., 282 F. App'x 958, 961 (2d Cir. 2008) (summary order); see also Mayers v. Emigrant Bancorp, 796 F. Supp. 2d 434, 448 (S.D.N.Y. 2011) ("An employee engages in a protected activity when she complains of an employment practice that she reasonably believes violates the law."). With respect to Defendants' knowledge that Plaintiff engaged in protected conduct, she need only show general corporate knowledge at the prima facie stage; accordingly, Penta's knowledge can be imputed to Patients Medical, whether or not Penta specifically communicated that Plaintiff engaged in protected conduct (or merely communicated that Plaintiff was pregnant). See Zann Kwan, 737 F.3d at 844. With respect to the fourth element, the temporal proximity of Plaintiff's complaint and her termination is sufficient to make a prima facie showing of causation. See id. at 845 ("The three-week period from [plaintiff's] complaint to her termination is sufficiently short to make a prima facie showing of causation indirectly through temporal proximity."). And, in the wake of Nassar, even if the but-for causation standard applies, it "does not alter the plaintiff's ability to demonstrate causation at the prima facie stage on summary judgment or at trial indirectly through temporal proximity." Id.

Defendants offer the same two justifications for their decision to terminate Plaintiff's employment: (1) the business was struggling financially, and (2) Plaintiff performed poorly as an administrative assistant. In light of these justifications, "the presumption of retaliation arising from the establishment of the prima facie case drops from the picture." Id.

At the third stage of the <u>McDonnell Douglas</u> framework, the court applies the same analysis that it performed regarding Plaintiff's claim of pregnancy discrimination. Here, the court again finds that a jury could reasonably find that Defendants' justifications for the termination are pretextual—in other words, that retaliation was a motivating factor in (or but-for cause of) the decision to terminate Plaintiff's employment—and therefore Defendants' motion for summary judgment on Plaintiff's retaliation claim under the NYSHRL is denied. In particular, Plaintiff has offered evidence that her termination quickly followed her voicing her concerns about pregnancy discrimination to Penta, and evidence that Defendants offered inconsistent explanations for her termination. <u>See</u> <u>id.</u> at 847 ("[A] plaintiff may rely on evidence comprising her prima facie case, including temporal proximity, together with other evidence such as inconsistent employer explanations, to defeat summary judgment at [the third] stage."). A jury may ultimately conclude that Plaintiff did not, in fact, engage in protected activity, or that Defendants' justifications are not pretextual and retaliation was not a motivating factor in (or but-for cause of) the decision to terminate Plaintiff's employment. On this record, however, summary judgment on Plaintiff's NYSHRL retaliation claim is inappropriate. <u>Cf.</u> <u>id.</u> at 846 n.5 ("In this case, the parties have put forward several alleged causes of the plaintiff's termination . . . . The determination of whether retaliation was a 'but-for' cause, rather than just a motivating factor, is particularly poorly suited to disposition by summary judgment, because it requires weighing of the disputed facts, rather than a determination that there is no genuine dispute as to any material fact."

3.    NYCHRL

The NYCHRL provides that "[i]t shall be an unlawful discriminatory practice for any person engaged in any activity to which this chapter applies to retaliate or discriminate in any

manner against any person because such person has (i) opposed any practice forbidden under this chapter . . . ." N.Y.C. Admin. Code § 8-107(7). "The NYCHRL is slightly more solicitous of retaliation claims than federal and state law because, rather than requiring a plaintiff to show an adverse employment action, it only requires him to show that something happened that was reasonably likely to deter a person from engaging in protected activity." Malena v. Victoria's Secret Direct, LLC, 886 F. Supp. 2d 349, 362 (S.D.N.Y. 2012) (internal quotation marks and citation omitted); see also Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 112 (2d Cir. 2013) ("In accordance with the Restoration Act's rules of construction, New York courts have broadly interpreted the NYCHRL's retaliation provisions." (citations omitted)). For example, "[t]he New York Court of Appeals has held that 'oppos[ing] any practice' can include situations where a person, before the retaliatory conduct occurred, merely 'made clear her disapproval of [the defendant's] discrimination by communicating to [him], in substance, that she thought [his] treatment of [the victim] was wrong.'" Id. (alterations in original) (quoting Albunio v. City of New York, 947 N.E.2d 135, 138 (N.Y. 2011)).

"It is unclear whether and to what extent the McDonnell Douglas framework has been modified for claims under the NYCHRL." Zann Kwan, 737 F.3d at 843 n.3. With respect to causation, "summary judgment is appropriate only if the plaintiff cannot show that retaliation played any part in the employer's decision"—in other words, the but-for standard that applies to Title VII retaliation claims (and may or may not apply to NYSHRL retaliation claims) does not apply to NYCHRL retaliation claims. See id. at 116.

Here, a jury could credit Plaintiff's testimony that she "opposed [an unlawful] practice" by raising her concerns to Penta about Patients Medical's prior alleged pregnancy discrimination and her fear of future discrimination against herself. A jury could also find that notwithstanding

evidence submitted by Defendants in support of their justifications that business was slow and Plaintiff performed poorly as an administrative assistant, retaliation played a role in the decision to terminate Plaintiff's employment.[16]  See, e.g., Malena, 886 F Supp. 2d at 363-65 (denying motion for summary judgment on NYCHRL retaliation claim); Kim v. Goldberg, Weprin, Finkel, Goldstein, LLP, 987 N.Y.S.2d 338, 343-44 (App. Div. 2014) (denying motion to dismiss NYCHRL retaliation claim where plaintiff twice complained to employer of discriminatory treatment and was terminated two months later, "sufficiently close in temporal proximity to infer a causal connection" (quoting Lamberson v. Six W. Retail Acquisition, Inc., 122 F. Supp. 2d 502, 510 (S.D.N.Y. 2000))).

### C.    Hostile Work Environment

Plaintiff contends that Defendants subjected to her to a hostile work environment during the ten business days between the announcement of her pregnancy and the termination of her employment.  For the reasons discussed below, the court GRANTS Defendants' motion for summary judgment with respect to Plaintiff's Title VII and NYSHRL claims, but DENIES Defendants' motion with respect to Plaintiff's NYCHRL claim.

### 1.    Title VII and NYSHRL

The same standard governs Title VII and NYSHRL hostile work environment claims. Tolbert v. Smith, 790 F.3d 427, 439 (2d Cir. 2015).  A Plaintiff must allege "conduct (1) that is "objectively" severe or pervasive—that is, if it creates an environment that a reasonable person would find hostile or abusive [the objective requirement], (2) that the plaintiff subjectively perceives as hostile or abusive [the subjective requirement], and (3) that creates such an

---

[16]  In addition, where a defendant cannot show that it is entitled to summary judgment under the McDonnell Douglas framework, see supra Part III.B.2 (denying motion for summary judgment on NYSHRL retaliation claim under McDonnell Douglas framework), "it would not be entitled to summary judgment under the more expansive standard of the NYCHRL." Zann Kwan, 737 F.3d at 843 n.3.

environment because of plaintiff's sex (or other characteristic protected by Title VII) [the prohibited causal factor requirement]." Gregory v. Daly, 243 F.3d 687, 691-92 (2d Cir. 2001) (alterations in original) (internal quotations marks and citations omitted).

With respect to the objective requirement, the plaintiff must show that the defendant's conduct was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (internal quotation marks and citation omitted). "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." Id. "The incidents complained of must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." Raspardo v. Carlone, 770 F.3d 97, 114 (2d Cir. 2014) (internal quotation marks and citation omitted). To determine whether an incident or series of incidents are severe or pervasive, "courts must assess the totality of the circumstances, considering elements such as 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Id. (quoting Harris, 510 U.S. at 23). Allegations of isolated incidents of discriminatory comments or conduct generally do not suffice. See Williams v. N.Y.C. Dep't of Sanitation, No. 00-CV-7371 (AJP), 2001 WL 1154627, at *13 (Sept. 28, 2001) (collecting cases). Still, "even a single incident of sexual assault sufficiently alters the conditions of the victim's employment and clearly creates an abusive work environment for purposes of Title VII liability." Tomka v. Seiler Corp., 66 F.3d 1295, 1305 (2d Cir. 1995), abrogated on other grounds by Burlington Indus. v. Ellerth, 524 U.S. 742 (1998). Finally, pregnancy discrimination and hostile work environment

are separate theories under Title VII and the NYSHRL; that a plaintiff has established a genuine issue of material fact with respect to one theory does not mean that she has necessarily done so with respect to the other. See, e.g., Peralta v. Roros 940, Inc., 72 F. Supp. 3d 385, 395-96 (E.D.N.Y. 2014) (denying motion for summary judgment on pregnancy discrimination claim and granting motion with respect to hostile work environment claim based on same evidence).

Even when viewed in the light most favorable to Plaintiff, a jury could not find that she was subjected to an objectively hostile work environment under Title VII or the NYSHRL on the basis of her pregnancy. As a threshold matter, Plaintiff contends that the work environment was hostile for a period of only two weeks—from the day after she announced her pregnancy, until the termination of her employment. She points to the following evidence from this brief period to support her claim: (1) Dr. Gulati required her to run "errands" and to lift heavy boxes on three occasions; (2) Dr. Gulati gave her "evil looks," and on one occasion, responded to her in a "nasty" manner; (3) Dr. Gulati told Plaintiff to cover her stomach and to wear bigger clothes three-to-four times per week, for two weeks (a total of six-to-eight times), and told her that her appearance was bad for business; (4) Dr. Gulati followed Plaintiff to the restroom and rushed her out; and (5) on the day before her termination, Dr. Gulati made a comment that Plaintiff would no longer need her nursing shoes, which had been destroyed by someone.

Certain of these items are not particularly probative evidence of a hostile work environment. For example, Plaintiff does not know who destroyed her shoes.[17] Plaintiff also admitted that pulling charts was part of an administrative assistant's role, and that she did not know whether prior administrative assistants also ran "errands" for Dr. Gulati.

---

[17] In addition to speculating about her shoes, Plaintiff speculated that Dr. Gulati "likes to torture pregnant women" because she heard from Penta that Dr. Gulati herself had "difficulties trying to get pregnant." (Pl. Dep. at 111:7-8, 263:2-13.) The court disregards these allegations as speculative and/or hearsay.

With respect to the comments made by Dr. Gulati (and the "evil looks"), these may have been inappropriate, but they are not severe or pervasiveness enough to alter the conditions of employment and support a hostile work environment claim. See, e.g., Augustin v. The Yale Club of N.Y.C., 274 F. App'x 76, 77 (2d Cir. 2008) (summary order) ("The worst of the allegations against the [defendant] involve episodes of name-calling, inappropriate behavior by a supervisor, and other perceived slights, which, however regrettable, do not constitute a hostile work environment even if taken as true."); Mark v. Brookdale Univ. Hosp., No. 04-CV-2497, 2005 WL 1521185, at *27 (E.D.N.Y. June 22, 2005) (defendant was entitled to summary judgment where plaintiff's hostile work environment claim was premised on two negative remarks about her pregnancy); Kennebrew v. N.Y.C. Hous. Auth., No. 01-CV-1654 (JSR) (AJP), 2002 WL 265120, at *13 (S.D.N.Y. Feb. 26, 2002) (report and recommendation) (granting summary judgment where the plaintiff made vague allegations of "eyerolling," "nasty" attitude by supervisors, and "picking and taunting" related to her pregnancy), adopted, Mem. & Order, No. 01-CV-01654 (JSR) (AJP) (S.D.N.Y. July 11, 2002); Cf., e.g., Torres v. Pisano, 116 F.3d 625, 628, 630-32 (2d Cir. 1997) (jury could find work environment hostile where plaintiff testified that harassment was "constant," including derogatory remarks about her anatomy, "ridicule" of her pregnancy, and suggestion that "she was in the habit of performing oral sex for money"). Nor has Plaintiff submitted facts indicating that Dr. Gulati's comments were threatening or humiliating. Indeed, Plaintiff testified that others did not overhear the comments. See, e.g., Young v. N.Y.C. Dep't of Educ., No. 09-CV-6621 (SAS), 2010 WL 2776835, at *10 & n.174 (S.D.N.Y. July 13, 2010) (dismissing hostile work environment claim where plaintiff could not show that supervisor humiliated him in front of others).

Similarly, Dr. Gulati's reaction to Plaintiff's bathroom usage, if true, was inappropriate, but was not severe or pervasive enough to render the work environment hostile. See Zambrano-Lamhaouhi v. N.Y.C. Bd. of Educ., 866 F. Supp. 2d 147, 174 (E.D.N.Y. 2011) (without additional evidence, a jury could not find hostile work environment where defendant subjected plaintiff to increased scrutiny during pregnancy, including her bathroom usage); Medina v. Adecco, 561 F. Supp. 2d 162, 173 (D.P.R. 2008) (granting summary judgment where supervisor made negative comments each time pregnant employee took pregnancy-related bathroom break).

In addition, a jury could not find, based on this record, that Dr. Gulati's actions during the two-week period interfered unreasonably with Plaintiff's work performance; indeed, for purposes of this motion, the court has accepted as true Plaintiff's testimony that she effectively performed the role of administrative assistant. See, e.g., Paul v. Postgraduate Ctr. for Mental Health, No. 12-CV-362 (VMS), --- F. Supp. 3d ---, 2015 WL 1508316, at *34 (E.D.N.Y. Mar. 31, 2015) (granting summary judgment and explaining that the plaintiff failed to submit any evidence that the alleged harassment negatively affected his work performance); Shepherd v. BCBG Max Azria Grp., Inc., No. 11-CV-7634 (RJS) (AJP), 2012 WL 4832883, at *22 (S.D.N.Y. Oct. 11, 2012) (report and recommendation) (granting summary judgment where the plaintiff "fail[ed] to allege how the conduct she complain[ed] of interfered with her ability to do her work), adopted, 2012 WL 6150854 (S.D.N.Y. Dec. 10, 2012).

For these reasons, Defendants' motion for summary judgment on Plaintiff's Title VII and NYSHRL hostile work environment claims is granted.

2.    NYCHRL

As discussed above, see supra Part III.A.2, the NYCHRL is subject to a more liberal standard than Title VII and the NYSHRL. With respect to hostile work environment claims, the

NYCHRL does not require a plaintiff to satisfy the "severe and pervasive conduct standard."
See Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 108 (2d Cir. 2013).
Rather, the inquiry is again whether the defendant's conduct "subjected [the plaintiff] to a
different set of employment conditions than her [] colleagues." Id. at 115. Summary judgment
for the defendant on an affirmative defense of triviality is only proper "if a reasonable jury could
not interpret the alleged comments as anything 'more than petty slights or trivial
inconveniences.'" Id. at 114 (quoting Williams v. N.Y.C. Hous. Auth., 872 N.Y.S.2d 27, 41
(App. Div. 2009)). In other words, "the broader purposes of the [NYCHRL] do not connote an
intention that the law operate as a 'general civility code,'" and summary judgment is appropriate
in "truly insubstantial cases." Williams, 872 N.Y.S.2d at 41 (internal citation omitted).
However, "[e]xperience has shown that there is a wide spectrum of harassment cases falling
between 'severe or pervasive' on the one hand and a 'merely' offensive utterance on the other.
Id. at 38.

Here, viewing the record in the light most favorable to Plaintiff, the NYCHRL hostile
work environment claim survives summary judgment. This is not a "truly insubstantial case[],"
id. at 41, in which a jury could only reasonably find in favor of Defendants' affirmative defense
that their actions were petty slights and trivial inconveniences. See id. ("[W]e assure employers
that summary judgment will still be available where they can prove that the alleged
discriminatory conduct in question does not represent a 'borderline' situation but one that could
only be reasonably interpreted by a trier of fact as representing no more than petty slights or
trivial inconveniences."). Plaintiff has presented evidence that upon announcing her pregnancy,
Defendants (and in particular, Dr. Gulati) immediately changed the way they acted toward her,
including telling Plaintiff to dress differently on multiple occasions and rushing her out of the

bathroom. She has also presented evidence that Dr. Gulati (the owner of Patients Medical and at the time Plaintiff's direct supervisor) told her that her prior administrative assistant's pregnancy had negatively affected her performance. While this conduct was not objectively severe or pervasiveness enough to alter the conditions of employment as a matter of law under federal and state law, the enablers of the NYCHRL specifically envisioned a law that would "accomplish[] . . . uniquely broad and remedial purposes . . . regardless of whether federal or New York State civil and human rights laws, including those laws with provisions comparably-worded to provisions of this title, have been so construed." N.Y.C. Admin. Code § 8-130. This appears to be such a case, and therefore Plaintiff's NYCHRL hostile work environment claim may proceed to trial, notwithstanding the dismissal of her Title VII and NYSHRL hostile work environment claims. Cf., e.g., Clarke v. InterContinental Grp., PLC, No. 12-CV-2671 (JPO), 2013 WL 2358596, at *11 (S.D.N.Y. May 30, 2013) (dismissing hostile work environment claim under Title VII, but declining to dismiss claims brought under NYCHRL).

**D.    Claims Against Judy Penta**

Plaintiff brings her NYSHRL and NYCHRL claims against all Defendants, including Penta in her individual capacity.[18] For the reasons discussed below, Defendants' motion for summary judgment on all NYSHRL and NYCHRL claims brought against Penta is GRANTED.

1.    NYSHRL

"The NYSHRL allows for individual liability under two theories: (1) if the defendant has 'an ownership interest' in the employer or has 'the authority to hire and fire employees,' Tomka v. Seiler Corp., 66 F.3d 1295, 1317 (2d Cir.1995) (discussing N.Y. Exec. Law § 296(1)), [or]

---

[18] An employer's agents cannot be held liable under Title VII. See generally Tomka v. Seiler Corp., 66 F.3d 1295, 1313-17 (2d Cir. 1995), abrogated on other grounds by Burlington Indus. v. Ellerth, 524 U.S. 742 (1998); see also, e.g., Salazar v. Ferrara Bros. Bldg. Materials Corp., No. 13-CV-3038 (JG) (VMS), 2015 WL 1535698, at *10 (E.D.N.Y. Apr. 6, 2015) (denying motion for summary judgment on Title VII claim against employer, but dismissing Title VII claims against individuals).

(2) if the defendant aided and abetted the unlawful discriminatory acts of others, N.Y. Exec. Law

§ 296(6)." E.E.O.C. v. Suffolk Laundry Servs., Inc., 48 F. Supp. 3d 497, 523 (E.D.N.Y. 2014).

With respect to the first theory, there are no genuine issues of material fact; although Penta

communicated to Plaintiff the decision to terminate her employment, she did not have an

ownership interest in Patients Medical, and was not authorized to hire or fire employees. Under

these circumstances, summary judgment is appropriate. See, e.g., Salazar v. Ferrara Bros. Bldg.

Materials Corp., No. 13-CV-3038 (JG) (VMS), 2015 WL 1535698, at *10 (E.D.N.Y.

Apr. 6, 2015) ("[T]here is no evidence that Annunziata, although he communicated Salazar's

termination to him, had either an ownership interest in the company or the authority to hire and

fire employees.").

 With respect to aiding and abetting liability under Executive Law § 296(6), "[a]

supervisor is an 'employer' for purposes of establishing liability under the NYSHRL if that

supervisor 'actually participates in the conduct giving rise to [the] discrimination.'" Feingold v.

New York, 366 F.3d 138, 157 (2d Cir. 2004) (quoting Tomka, 66 F.3d at 1317). The Second

Circuit has held that "a co-worker who 'actually participates in the conduct giving rise to a

discrimination claim'" can be "held liable under the NYSHRL even though that co-worker

lacked the authority to either hire or fire the plaintiff." Id. at 158 (quoting Tomka, 66 F.3d

at 1317). "Aiding and abetting liability requires that the aider and abettor share the intent or

purpose of the principal actor, and there can be no partnership in an act where there is no

community of purpose." Brice v. Sec. Operations Sys., Inc., No. 00-CV-2438 (GEL), 2001

WL 185136, at *4 (S.D.N.Y. Feb. 26, 2001) (Lynch, J.) (internal quotation marks and citations

omitted). "Consequently, to find that a defendant actually participated in the discriminatory

conduct requires a showing of direct, purposeful participation." Id. (internal quotation marks and citation omitted).

Here, Plaintiff did not make any allegations in the Complaint on a theory of aiding and abetting liability; rather, she alleged that each individual Defendant, including Penta, directly engaged in discriminatory or retaliatory conduct. (See generally Compl.) In any event, a reasonable jury could not find that Penta aided and abetted unlawful discrimination against Plaintiff—in other words, that she actually participated in the conduct giving rise to Plaintiff's discrimination claim. The only evidence Plaintiff offers related to Penta's participation is that she received Plaintiff's informal complaint concerning a fear of discrimination, assigned work on limited occasions that may have been a normal part of the administrative assistant role, and communicated the termination to Plaintiff, and in doing so, made a comment that could be viewed as corroborating Plaintiff's theory that Patients Medical discriminated against pregnant employees. From these limited facts, a jury could not find that Penta aided and abetted the other Defendants' discriminatory and retaliatory acts, or their creation of a hostile work environment. Cf., e.g., Feingold, 366 F.3d at 144-45, 157-58 (reversing grant of summary judgment on NYSHRL claims against co-workers and supervisors where record, viewed in a light favorable to plaintiff, showed (1) co-workers actively created a hostile work environment, including by repeatedly making anti-Semitic and anti-gay remarks and by telling plaintiff he could not be openly gay at work; (2) co-workers assigned plaintiff a disproportionate amount of work; and (3) supervisors not only took no action to remedy discriminatory behavior, but also terminated plaintiff's employment on the basis of impermissible factors); Tomka, 66 F.3d at 1317 (co-workers aided and abetted hostile work environment by sexually assaulting plaintiff); Guzman v. News Corp., No. 09-CV-9323 (LGS), 2013 WL 5807058, at *21 (S.D.N.Y.

Oct. 23, 2013) (denying motion for summary judgment where individual defendant helped make decision to terminate plaintiff's employment and where defendant's "comments and behavior also ostensibly contributed to her hostile work environment"); Ingenito v. Riri USA, Inc., No. 11-CV-2569 (MKB), 2013 WL 752201, at *14 (E.D.N.Y. Feb. 27, 2013) (denying motion for summary judgment where plaintiff established that individual defendant was "the primary actor," "had anti-pregnancy animus," and "was a motivating cause for Plaintiff's termination").

      2.    NYCHRL

      The NYCHRL provides that "[i]t shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this chapter, or to attempt to do so." N.Y.C. Admin. Code § 8-107(6). Notwithstanding the substantive differences between the breadth of the NYCHRL and the NYSHRL, see supra Parts III.A.2, III.B.3, III.C.2, "[t]he same standards of analysis used to evaluate aiding and abetting claims under the NYSHRL apply to such claims under the NYCHRL because the [relevant] language of the two laws is virtually identical." Feingold, 366 F.3d at 158 (internal quotation marks and citation omitted); see also, e.g., Guzman, 2013 WL 5807058, at *21-22 (analyzing individual liability under NYSHRL and NYCHRL simultaneously); White v. Pacifica Found., 973 F. Supp. 2d 363, 377-78 (S.D.N.Y. 2013) (same). For the same reasons discussed above with respect to the NYSHLR claims against Penta, a jury could not find that Penta acted as Plaintiff's employer (i.e., had authority to terminate Plaintiff's employment or had an ownership interest in Patients Medical), or that she aided or abetted any unlawful discrimination or retaliation, or the creation of a hostile work environment, by the other Defendants. Accordingly, all NYSHRL and NYCHRL claims brought against Penta are dismissed.

## IV. CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART. The motion is granted with respect to the following claims, which are dismissed:

- Plaintiff's Title VII retaliation claim against Patients Medical;

- Plaintiff's Title VII and NYSHRL hostile work environment claims against Patients Medical, Dr. Gulati, and Mr. Gulati; and

- All of Plaintiff's NYSHRL and NYCHRL claims against Penta. The Clerk of Court is respectfully directed to terminate Penta from this case.

The motion is denied with respect to the following claims, which, absent settlement, will proceed to trial:

- Plaintiff's Title VII pregnancy discrimination claim against Patients Medical, and her NYSHRL and NYCHRL pregnancy discrimination claims against Patients Medical, Dr. Gulati, and Mr. Gulati;

- Plaintiff's NYSHRL and NYCHRL retaliation claims against Patients Medical, Dr. Gulati, and Mr. Gulati; and

- Plaintiff's NYCHRL hostile work environment claim against Patients Medical, Dr. Gulati, and Mr. Gulati.

Finally, the parties are directed to contact Magistrate Judge Mann's chambers to schedule the filing of a Joint Pretrial Order in accordance with this court's Individual Rules, to be electronically filed no later than October 30, 2015. The parties are further directed to confer and to contact the court's Deputy at 718-613-2545 to set a trial date.

SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York
      September _, 2015

NICHOLAS G. GARAUFIS
United States District Judge